IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDRE WESTBROOK | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL[1], | : | |
| Commissioner of Social Security | : | NO. 18-5105 |

O P I N I O N

JACOB P. HART                                                               DATE: 12/11/2019
UNITED STATES MAGISTRATE JUDGE

      Andre Westbrook brought this action under 42 USC §405(g) to obtain review of the decision of the Commissioner of Social Security denying his claim for Supplemental Security Income. He has filed a Request for Review to which the Commissioner has responded. As set forth below, I will direct that this matter be remanded for a determination regarding his ability to walk and/or stand which is consistent with the medical and other evidence, and to obtain additional vocational expert testimony to determine whether work is available which would accommodate the new RFC assessment.

I.     <u>Factual and Procedural Background</u>

      Westbrook was born on October 5, 1966. Record at 320. He left school after the ninth grade. Record at 354. He has no past relevant work within the meaning of the regulations, although he worked as a laborer in the distant past. Record at 29, 354.

      In March, 2009, Westbrook was awarded SSI benefits on the basis of a major depressive disorder with psychotic features. Record at 219-231. However, his benefits were terminated in August, 2013, when he was incarcerated. Record at 349.

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R Civ. Pr. 25(d); <u>and</u> <u>see</u> 42 USC §405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security … .").

On January 16, 2015, Westbrook filed an application for benefits in this case. Record at 320. In it, he asserted disability as of October 10, 2006, as a result of schizophrenia, depression, anxiety, high blood pressure, gout, and disc disease. Record at 320, 353. His application was denied on May 13, 2015. Record at 245. Westbrook then sought *de novo* review by an Administrative Law Judge ("ALJ"). Record at 253.

A hearing was held in this case on August 29, 2017. Record at 61. In a written decision dated September 18, 2017, however, the ALJ denied benefits. Record at 18. The Appeals Council denied Westbrook's request for review, permitting the ALJ's decision to stand as the final decision of the Commissioner. Record at 1. Westbrook then filed this action.

II.   Legal Standards

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, supra at 401; Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. § 423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv). At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v). At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

III.   The ALJ's Decision and Westbrook's Request for Review

The ALJ determined that Westbrook suffered from the severe impairments of lumbar disc bulges, gout, and a depressive disorder. Record at 20. He found that none of these impairments, and no combination of impairments, met or medically equaled a listed impairment. Record at 21. He determined that Westbrook retained the residual functional capacity ("RFC") to engage in light work, with six hours of sitting, standing, or walking in an eight-hour workday. Record at 23. He also limited Westbrook to simple one or two-step tasks in a routine, stable, work environment with very little change and no more than occasional interaction with co-workers, supervisors, or the public. Id.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ found that Westbrook could work as a bench assembler, packer, or housekeeping cleaner. Record at 29. He determined, therefore, that Westbrook was not disabled. Record at 30.

In his Request for Review, Westbrook argues that the ALJ erred in finding that he could engage in light work; wrongly assessing the evidence regarding his mental impairment; failing to include a limitation in his hypothetical questions to the vocational expert which would accommodate his moderate limitations in concentration, persistence and pace; and failing to consider medical evidence submitted before he issued his decision.

IV.     Discussion

A.      Light Work with Six Hours of Standing or Walking

As above, in his RFC assessment, the ALJ decided that Westbrook could engage in light work with six hours of either sitting, standing, or walking. Westbrook argues that this was inconsistent with the evidence regarding his impairments of the feet and legs.

Initially, the ALJ found that Westbrook's "frequent complaints of right ankle pain", frequent ankle injections, and use of Percocet "underscore[d] the intensity" of his ankle pain. Record at 26. He noted that Westbrook used a right ankle orthotic boot, and walked with a cane. Record at 25, 26. Nevertheless, the ALJ went on to explain that an absence of inpatient hospitalizations or frequent emergency room visits to address ankle pain "suggest[ed] less intense and persistent symptoms managed with more conservative treatment." Record at 26. He concluded that Westbrook was capable of a "reduced but greater than basic" range of exertion. Id.

This reasoning is not entirely satisfactory. An absence of hospitalizations or emergency care might be sufficient to show that Westbrook was not rendered completely unable to walk by his ankle impairment. However, it is not strong support for a finding that he was capable of walking and/or standing six hours every workday, given his "intense" ankle pain, and frequent treatment with orthotics, injections and narcotics.

Also, the ALJ's conclusion was based on several patent mistakes of fact. After finding that Westbrook was capable of a "reduced but greater than basic" range of exertion, the ALJ explained: "This is consistent with reports of the claimant playing basketball, trying to walk to the store in a regular day, and testimony of walking three to four **hours** before the hearing." Id. (Emphasis supplied). In fact, Westbrook testified that he could walk "three or four **houses**" down the street, before taking a break. Record at 73.

The Commissioner argues that this mistake on the part of the ALJ was not meaningful, because the evidence otherwise supported his RFC findings. However, it is clear that the ALJ was influenced by Westbrook's supposed ability to walk for three of four hours at a time. He repeated this erroneous quotation in three places in his decision. Record at 21, 24, 26. This is not surprising; if Westbrook had really testified that he could walk what amounts to six or nine miles, his claims of limitation would have been severely undermined. However, this was not his testimony.

Further, although the ALJ found Westbrook's gout to be a severe impairment, he wrote that "the record [did] not include medical evidence of acute gout flares during the relevant period, suggesting stability." Record at 26. This was inaccurate. Although many records regarding gout date from 2012, medical records prepared by Lawrence Kasson, DPM, a podiatrist, also showed "gout/arthritis flares," usually in the right ankle, on September 2, 2016, November 18, 2016, January 13, 2017, and February 17, 2017. Record at 885, 883, 882, 881. Objective signs included edema. Id. Westbrook also stated on January 13, 2015, that his latest flare-up of gout was a month earlier. Record at 728.

5

The medical records also show that Westbrook suffered from foot impairments other than gout. On July 19, 2012, podiatrist Steven Boc, D.P.M., wrote that Westbrook had flat feet "with biomechanical problems contributing to the tenosynovitis and tendinitis." Record at 891. Orthopedist notes from August, 2016, also diagnosed Westbrook's flat feet as severe enough to require an orthotic to correct pronation. Record at 886, 887.

Further, the ALJ noted that objective testing in August, 2015, suggested Westbrook suffered from bilateral tarsal tunnel syndrome. Record at 25, 909. The ALJ wrote that these findings "carr[ied] less significance without direct evidence of contemporaneous clinical findings." In fact, however, there were contemporaneous clinical findings. In the same September 14, 2015, treatment note, in which he reported the test results, Dr. Boc observed "right leg numbness/tingling", and that "pain is present in the medial aspect of the right ankle," as well as a positive Tinel's signal on both tibial nerves. Record at 909. Tarsal tunnel syndrome causes "pins and needles" and pain, down the back of the leg or in the sole of the foot or inside the ankle. Http://Healthline.com/health/tarsal-tunnel-syndrome#symptoms. (Visited December 4, 2019).

Thus, there is a lack of substantial evidence supporting the ALJ's conclusion that Westbrook could walk for six hours, or stand for six hours, in an eight-hour workday. For that reason, I will order that the matter be remanded so that the ALJ can revise the RFC assessment to reduce the number of walking and standing hours to a level consistent with the medical and other evidence, and can then obtain additional vocational expert testimony to determine whether work is available which would accommodate the new RFC assessment.

B.  Westbrook's Mental Impairment

Westbrook argues that the ALJ's evaluation of the evidence of mental illness was defective. He maintains that, along with depression, his paranoia/psychosis and memory impairments should have been found to constitute severe impairments. He also claims that the ALJ erred in failing to give great weight to the opinions of his treating mental health practitioners at CATCH Behavioral Health and Intellectual Disabilities Center; psychiatrist Theodore Wasserman, MD, and therapist Nina Gorman. As a related matter, Westbrook also maintains that the ALJ's finding that his mental health records showed "generally unremarkable findings" was inconsistent with the record.

It is difficult to say whether the ALJ erred in failing to identify paranoid psychosis or memory impairments as separate mental impairments. The Commissioner argues that they are actually "symptoms rather than impairments." Commissioner's Brief at 6.[2] Further, a July 11, 2017, treatment plan listed Westbrook's diagnosis as persistent depressive disorder, even though he was also described as suffering from "trouble with anger and psychosis." Record at 966. Yet, on February 5, 2015, Dr. Wasserman gave Westbrook a rule-out diagnosis of paranoid schizophrenia, and not depression. Record at 651. Paranoid schizophrenia was also the diagnosis on the October 6, 2015, Medical Source Statement form completed by Dr. Wasserman and Ms. Gorman. Record at 799.

---

[2] Wallace v. Astrue, Civ. A. No. 09-143J, 2010 WL 3604451 (W.D. Pa. Sep. 14, 2010), cited by the Commissioner is not helpful. It presents a much clearer case, where flank pain, nausea, and vomiting were found to be symptoms of kidney stones, and not separate impairments which should have been listed at Stage 2. Id. at *3.

Crucially, the ALJ did not ignore evidence in the record regarding psychosis and memory impairments. He acknowledged complaints of auditory hallucinations and visions reported by Dr. Wasserman and Dorothy Latella-Zakhireh, Psy. D., the consulting examiner; and delusions reported to Kathryn Lester, Psy.D. and G. Peter Gliebus, MD, who conducted neuropsychological examinations of Westbrook. Record at 26, 27. He also mentioned Dr. Wasserman's rule-out diagnosis of paranoid schizophrenia. Record at 26. As to memory loss, the ALJ described in detail testing Westbrook underwent on February 8, 2016, by Drs. Carol Lippa and David Libon, of the Drexel University Neurosciences Institute, which indicated grave memory problems suggesting "possible dementia." Record at 26, 809-812. Because the ALJ discussed both psychosis and memory impairment in detail, even if he erred in failing to find them to be separate, severe, impairments, the error was not meaningful.

In the Medical Source Statement they completed, Dr. Wasserman and Ms. Gorman reported that Westbrook was not a malingerer, and that he suffered from many symptoms of mental illness, including mood disturbance, delusions or hallucinations, illogical thinking or loosening of associations, and paranoia or inappropriate suspiciousness. Record at 799-780. They opined that he would miss work more than three times a month, and that he would have difficulty working at a regular job on a sustained basis, because working had caused an increase in paranoid symptoms in the past. Record at 801. They indicated that Westbrook had moderate restrictions in his activities of daily living, marked difficulties in maintaining social functioning, and often had deficiencies in concentration. Record at 802.

8

The ALJ gave this report, which he attributed solely to Ms. Gorman, "little weight," calling it inconsistent with evidence that, in April and May, 2015, Westbrook attended only one therapy session a month "with generally unremarkable clinical findings." Record at 27, and see 26. I would agree with Westbrook that this two-month sample size seems a bit weak to support an almost total discrediting of the treating practitioners' report.

Perhaps, there is also some basis for Westbrook to dispute the ALJ's description of his history as "unremarkable" even though it includes hallucinations of a witch, and an incident where he punched his nephew at a family event for flirting with his girlfriend. Record at 658 (treatment note of April 24, 2015), 659 (treatment note of March 31, 2015). A May 13, 2015, treatment note also evidences continued hallucinations, as it notes that Westbrook was "questioning/battling voices and visions." Record at 657.

Nevertheless, in the relevant period, Westbrook was never hospitalized or treated at a partial hospitalization program for his mental illness. Indeed, he told Dr. Latella-Zakhireh, the consulting mental health expert, that he had never had a psychiatric hospitalization. Record at 785. He also told Dr. Latella-Zakhireh that he had therapy only twice per month. Id. Even if Westbrook actually had therapy once per week, as he claimed at the hearing, this is not a very intensive treatment program. Nor was Westbrook arrested or evicted in the relevant period, which might have indicated extreme behavior.

Further, as the ALJ discussed, at Westbrook's initial evaluation by Dr. Wasserman on February 6, 2015, he was noted to be fully oriented, with an appropriate and "well-modulated" affect. Record at 651. At therapy sessions, he was described as depressed and anxious, but not delusional, and often with a normal affect and appearance. Record at 657, 658, 659, 662, 663, 664.

9

Dr. Latella-Zakhireh, who met with Westbrook on April 27, 2015, described him as not fully oriented, with mildly impaired concentration and memory, and poor cognitive functioning. Record at 788. Nevertheless, she also wrote that Westbrook was cooperative, and guarded but relatively friendly, with "fairly appropriate" interpersonal skills. Record at 787. He showed no evidence of hallucinations or paranoia at that time. Id.

Moreover, Dr. Latella-Zakhireh indicated in a functional assessment that Westbrook was only mildly restricted in the ability to understand, remember or carry out simple instructions, and moderately limited the ability to make simple work-related decisions; to understand, remember or carry out complex instructions; and to make complex work-related decisions. Record at 791. He was mildly to moderately restricted in his ability to interact appropriately with the public, supervisors, and co-workers, and was moderately restricted in his ability to respond to changes in the work setting. Record at 792. Similarly, Richard Williams, Ph.D., a reviewing agency expert, opined that Westbrook was only mildly restricted in his activities of daily living, and moderately limited in concentration and in maintaining social functioning. Record at 236.

What is more, Westbrook underwent follow-up neuropsychological testing at Drexel in March, 2017, conducted by Drs. Lester and Gliebus. Record at 969. There, Westbrook was found to have expended "suboptimal effort," so that the cognitive test results were invalid. Record at 971. Apparently, "similar effort concerns" were raised during the February, 2016, testing "on an embedded measure of performance validity." Id. A brain MRI performed on February 14, 2017, was normal. Record at 969. There was no indication of cerebral atrophy. Record at 971. Here, too, Westbrook displayed "no evidence of delusions, hallucinations, or formal thought disorder". Id.

Undoubtedly, the record contained evidence of a severe and chronic mental health disorder. Nevertheless, substantial evidence supported the ALJ's conclusion that Westbrook's mental health permitted him to work with certain relevant restrictions.

C.    Westbrook's Limitation in Concentration, Persistence, and Pace

At the hearing, the ALJ asked the vocational expert hypothetical questions positing an individual who required "simple one or two-step tasks in a routine, stable work environment with very little change." Record at 66. This was consistent with the limitations he imposed in his RFC assessment. Record at 23.

Relying upon Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004), Westbrook argues that this limitation was not sufficient to accommodate the moderate impairment in concentration, persistence, or pace from which the ALJ had found him to suffer at the third stage of the sequential evaluation. Record at 22. In Ramirez, the Court of Appeals for the Third Circuit found a restriction to "no more than simple one or two-step tasks" was inadequate. Id. at 554.

Even after Ramirez, there is a great deal of uncertainty in this Circuit as to what limitation adequately addresses a moderate impairment in concentration, persistence or pace. In some cases, a limitation to "simple, unskilled" work has still been found sufficient.   McBeth v. Colvin, Civ. A. No. 12-3583, 2013 WL 6061364 (E.D. Pa. Nov. 18, 2013) at *17 citing McDonald v. Astrue, 293 F. App'x 941, 946-7 (3d Cir. 2008), and Menkes v. Astrue, 262 F. App'x 410, 412-3 (3d Cir. 2008), and see Parks v. Commissioner of Social Security, 401 F. App'x 651, 655-6 (3d Cir. 2010);  Gunter v. Colvin, 2014 WL 4186501 at *4 (E.D. Pa. Aug. 24, 2014); Suarez v. Astrue, Civ. A. No. 12-3373, 2013 WL 7203845 at *6, n. 1 (E.D. Pa. May 8, 2013); Shaffer v. Colvin, Civ. A. No. 13-925, 2014 WL 4925067 at *5 (W.D. Pa. Sep. 30, 2014); and Douglas v. Astrue, Civ. A. No. 09-1535, 2011 WL 482501 (E.D. Pa. Feb. 4, 2011).

11

In another case, a limitation to "routine, repetitive tasks" was found adequate. McCall v. Colvin, Civ. A. No. 13-4770, 2015 WL 9302929 at *9 (E.D. Pa. Dec. 22, 2015). In Perez v. Colvin, Civ. A. No. 14-4853, 2016 WL 5027734 (E.D. Pa. Sep. 20, 2016), a limitation to "simple routine tasks, simple short instructions, simple work-related decisions and few workplace changes" was approved. A restriction to "one and two-step tasks and few work changes" was found adequate in Santiago v. Astrue, Civ. A. No. 11-3650, 2012 WL 1080181 at *9 (E.D. Pa. Mar. 28, 2012).

On the other hand, in Plank v. Colvin, 2013 WL 6388486 at *10 (E.D. Pa. Dec. 6, 2013), the same "simple, unskilled" language was rejected. A limitation to "no detailed instructions" was rejected in Sawyer v. Berryhill, 305 F. Supp.3d 664 (E.D. Pa. Apr. 5, 2018). At times, even more detailed restrictions have been found to be inadequate. See White v. Colvin, Civ. A. No. 13-4793, 2016 WL 1221428 (E.D. Pa. Mar. 29, 2016) ("unskilled work with routine, repetitive tasks" inadequate); Deitz v. Astrue, Civ. A. No. 06-5053, 2008 WL 577000 at *11 (D.N.J. Feb. 29, 2008) ("low-stress work involving simple and routine job instruction" inadequate); Barry v. Astrue, Civ. A. No. 05-1825, 2007 WL 2022085 at *4 (E.D. Pa. July 9, 2007); Steininger v. Barnhart, Civ. A. No. 04-5383, 2005 WL 2077375 at *3-4 (E.D. Pa. Apr. 24, 2005) (rejecting a restriction to simple, repetitive tasks with only occasional contact with public and co-workers).

Since the ALJ in this case posed a hypothetical question including limitations which went beyond the precise language at issue in Ramirez, I cannot conclude that the ALJ violated Ramirez. This is particularly true in light of the post-Ramirez decisions of the Third Circuit Court of Appeals in McDonald and Menkes. In Menkes, the Court explained that: "[P]erforming a 'simple, routine task' typically involves low stress level work *that does not require maintaining sustained concentration*." 262 Fed. Appx. at 412. (Emphasis supplied).

12

Although neither McDonald nor Menkes is a precedential case, they provide a clear indication of the thinking of the Court of Appeals in this circuit.[3]

D.    Evidence Submitted After the Hearing but Before the Decision

On September 13, 2017, several weeks after Westbrook's August 29, 2017, hearing, but five days before the ALJ issued his decision, Westbrook submitted a letter report dated September 5, 2017, which was authored by Ms. Gorman, his therapist, and Farrell Lines, MD, a treating psychiatrist at CATCH. Record at 60. The letter did not report any striking new event or diagnosis, but it clarified the view of Westbrook's treating mental health professionals as to his history, symptoms, and daily functioning. Id. The ALJ did not mention the letter in his decision, and it was not included among the exhibits to his decision.

The regulations require that – except in very specific circumstances which do not apply here – a claimant either submit or inform the agency about all relevant evidence at least five business days before the date of a hearing before an ALJ. 20 CFR §416.1435, SSR 17-4p. Six days before the hearing, Westbrook's counsel submitted a letter to the ALJ which stated, in relevant part:

> [W]e hereby notify the Administration that the following records have been requested but not yet received: 1. Dr. Steven Russell; 2. Dr. William Wright; 3. Philadelphia Corporation for Aging; 4. CATCH; 5. Drexel Neurosciences Institute; 6. Homemaker Service
>
> We respectfully request the record remain opening [*sic*] pending receipt of this material.

Record at 473.

---

[3] The Commissioner also points to an interesting case in which a Magistrate Judge in the District Court for the Western District of Pennsylvania said: "Plaintiff cannot secure a remand pursuant to Ramirez simply by identifying a moderation limitation in concentration, persistence, or pace, and then comparing the RFC to the RFC in Ramirez. Instead, Plaintiff must demonstrate … additional limitations are needed and that there is no 'valid explanation' for their omission." Walck v. Colvin, Civ. A. No. 15-1265, 2017 WL 3405115 at *14 (M.D. Pa. Mar. 17, 2017), adopted 2017 WL 3394399 (W.D. Pa. Aug. 8, 2017). Westbrook has done no more than identify the limitation in concentration, and then cite Ramirez, which was found to be inadequate in Walck and the cases it cites. See Orndorff v. Colvin, 215 F.3d 391, 409 (M.D. Pa. 2016).

The Commissioner argues that this notice did not compel an ALJ to accept after-submitted evidence. It did not mention the report from Ms. Gorman and Dr. Lines; indeed, it did not mention any specific evidence at all. It simply listed providers. In any event, the CATCH report at issue here was created after the hearing, and did not concern any specific testing or events which occurred prior to the hearing. It is clearly not a "record" which was "requested but not yet received" by the hearing date. In other words, it could not have been – as Westbrook has described it in his brief – an "outstanding record" because it did not exist at the time he wrote to the ALJ   The ALJ was not required to consider it under 20 CFR §416.1435.

V.     Conclusion

In accordance with the above discussion, I will direct that this matter be remanded for a finding as to Westbrook's ability to walk and/or stand which is consistent with the medical and other evidence, and to obtain additional vocational expert testimony to determine whether work is available which would accommodate the new RFC assessment.


BY THE COURT:


/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE